STATE OF CONNECTICUT *v.* ANTHONY EDWARD STRONG, JR.
(AC 31087)

Flynn, C. J., and Alvord and Hennessy, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued March 8—officially released June 22, 2010

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Paul J. Narducci, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Anthony Edward Strong, Jr., appeals from the judgments of conviction, following a jury trial, of criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1), reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a), two counts of threatening in the second degree in violation of General Statutes § 53a-62 (a) (1), threatening in the second degree in violation of General Statutes § 53a-62 (a) (2), assault in the third

degree in violation of General Statutes § 53a-61 (a) (1) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (C).[1] On appeal, the defendant claims that the trial court improperly (1) failed to instruct the jury on the intent and conduct necessary to find him guilty of kidnapping in accordance with *State* v. *Salamon*, 287 Conn. 509, 550, 949 A.2d 1092 (2008) (en banc), (2) instructed the jury that it could use evidence without restriction despite admitting such evidence for a specific limited purpose and (3) failed to instruct the jury regarding the proper use of evidence that had been admitted for only a limited purpose. We affirm the judgments of the trial court.

The defendant and the victim[2] were married in 2005. The marriage, however, was plagued by violence; the defendant yelled at the victim, called her names, hit her, kicked her and gave her black eyes. After having been married for less than two years, the victim and the defendant separated and were no longer living together. On February 8, 2007, the defendant asked the victim to meet him at BJ's Wholesale Club (BJ's) in Waterford because he had some things to give her. The defendant and the victim met at BJ's, and the defendant accompanied the victim while she shopped. After walking with the victim to her car, the defendant went to his car and retrieved a black bag. The defendant and the victim then sat in the victim's car. The victim testified that the defendant removed a silver and black handgun from the black bag and pressed it to her side. He was yelling at her and told her to drive. He ordered: "I want you to do what I tell you to do, and if you don't,

---

[1] The defendant was found not guilty of kidnapping in the first degree with a firearm in violation of § 53a-92a (a) (2) (C) and criminal possession of a pistol in violation of General Statutes § 53a-217c (a) (1), and the court declared a mistrial on the charge on attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1).

[2] We decline to identify the victim by name in the interest of protecting her privacy. See *State* v. *Ramirez*, 292 Conn. 586, 588 n.2, 973 A.2d 1251 (2009).

I'll just cap you right where you are." The victim stated that she understood that to mean that the defendant would shoot her. The victim was crying and very upset. Initially, the defendant instructed the victim to drive down a particular road, which led to a desolate area. The victim feared that the defendant was going to kill her and, instead, drove onto Interstate 95. The defendant instructed the victim to drive to the home of his friend, Timothy Bryant, which is located in Niantic. The victim parked in Bryant's driveway and did not feel free to leave; the defendant continued to hold the handgun, or he had it in his lap. The defendant told her that his friends were going to rape her. Several of the defendant's friends, as they were heading into Bryant's house, passed the victim and the defendant as they sat in the car. The defendant asked one of his friends, Jay Floyd, what he wanted him to do with the victim, saying that her life was in Floyd's hands. Floyd responded that she was the defendant's wife and that they needed to work this out. He then walked away, while the victim was crying.

After being held for more than one hour, the victim, who has a heart condition, began wheezing and holding her chest. The defendant told the victim that he was sorry and that he only wanted to scare her. The defendant called Jermaine Floyd, another of his friends who was inside the Bryant house, and asked that some water and tissue be brought out to the car for the victim, which Jermaine Floyd did. Shortly thereafter, the victim told the defendant that she wanted to go home and that she needed to use the restroom. The defendant told her that she could not go home, but he did telephone Bryant and told him that he and the victim were entering the house so that she could use the restroom. The defendant accompanied the victim into the house and permitted her to use the restroom. They returned to the victim's car. The victim was able to convince the defendant that

she would not tell anyone about this incident and that she would go away with him the following weekend. The defendant permitted the victim to drive him back to his car, which remained at BJ's. After arriving at BJ's, the defendant asked the victim if he could stay at her house, but the victim declined, assuring the defendant that she would go away with him, however.

As the victim drove home to Groton, she noticed that the defendant was following her in his vehicle. Once she arrived at home, the victim entered the garage and locked all the doors. The victim's friend happened to stop by and, upon his arrival, she told him what had happened. The defendant returned to the victim's home later that night and began banging on the door. He continued banging for fifteen to twenty minutes. The victim told the defendant through the locked front door that she did not want to talk to him. The defendant continued to telephone the victim all through the night on both her home telephone and on her cellular telephone, more than forty times.

The following morning, February 9, 2007, the victim was driving south on Interstate 95, heading to work, when she passed the defendant's vehicle. The defendant followed the victim onto Route 9, where he tried to get her to pull over. When the victim would not pull over, the defendant slammed his vehicle into the victim's vehicle two times, causing her to lose control of the car. His third attempt to slam into her vehicle failed. After the defendant ran the victim's car off of the road, the victim was unable to open her door, and she gestured to a truck driver, Walter Labrie, to telephone the police. The defendant went to the victim's car and tried to open the driver's side door, which would not open. He jumped onto the hood of the victim's car, kicked the windshield several times and proceeded to smash the rear passenger's side window, which gave him access to the inside of the car. After getting into the

car, the defendant began scolding the victim for what she had "made [him] do." Labrie saw "hands flying" and knew that the defendant and the victim were having a heated discussion. A man driving a sport utility vehicle stopped and assisted the victim in getting out of the car. Once she was out, he drove her a short way down the street after she explained to him that this was a domestic violence incident. The defendant soon got out of the victim's car and initially started following the victim but soon left the area on foot.

The victim was very upset and was crying. Labrie, who had witnessed much of the incident, testified that the defendant's acts appeared to be deliberate. The state police responded to the scene after having been alerted by several calls of erratic operation on Interstate 95 and on Route 9 and about a crash with someone standing on top of one of the cars. The police reported that the victim appeared "really shaken up . . . like someone who had been through a traumatic experience." While the police still were on the scene and the victim was seated in one of the police cruisers, the defendant repeatedly telephoned her on her cellular telephone. During one of these conversations, one of the police officers spoke with the defendant and encouraged him to flag down a police cruiser, but the defendant refused. After a search, the police were unable to locate the defendant, who turned himself in to the police four days later.

The state charged the defendant in two informations. In docket number CR-07-291325, the state charged the defendant with kidnapping in the first degree with a firearm in violation of § 53a-92a, kidnapping in the first degree in violation of § 53a-92 (a) (2) (C), criminal possession of a pistol in violation of General Statutes § 53a-217c (a) (1), threatening in the second degree in violation of § 53a-62 (a) (1) and threatening in the second degree in violation of § 53a-62 (a) (2) for the incidents

occurring on February 8, 2007. In docket number CR-07-179263, the state charged the defendant with attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), criminal mischief in the first degree in violation of § 53a-115 (a) (1), attempt to commit assault in the second degree in violation of §§ 53a-49 (a) (2) and 53a-60 (a) (1), reckless endangerment in the first degree in violation of § 53a-63 (a) and threatening in the second degree in violation of § 53a-62 (a) (1) for the incident that occurred on February 9, 2007. The state requested that the cases be joined for trial before the jury, and the defendant did not object.

The jury returned a verdict of guilty in docket number CR-07-291325 on the charges of kidnapping in the first degree and two counts of threatening in the second degree. The jury found the defendant not guilty of kidnapping in the first degree with a firearm and criminal possession of a pistol. The court sentenced the defendant to a twenty year term of imprisonment on the charge of kidnapping in the first degree and to a concurrent one year term of imprisonment on each of the threatening charges.

In docket number CR-07-179263, the jury returned a verdict of guilty on the charges of criminal mischief in the first degree, assault in the third degree, as a lesser included offense of the charge of attempt to commit assault in the second degree, reckless endangerment in the first degree and threatening in the second degree. The court declared a mistrial on the charge of attempt to commit assault in the first degree because the jury was unable to reach a verdict. The court sentenced the defendant to a five year term of imprisonment on the criminal mischief count and to a one year concurrent sentence on each of the remaining three counts. The defendant's total effective sentence on both dockets was twenty years imprisonment. This appeal followed.

## I

On appeal, the defendant first claims that our Supreme Court's "decision in *State* v. *Salamon* [supra, 287 Conn. 509] requires reversal of the defendant's conviction for kidnapping because the jury was not properly instructed on the intent and conduct necessary to find the defendant guilty of that crime." The defendant argues that although the court instructed the jury "in accordance with [the] then applicable precedent governing the interpretation of the kidnapping statutes," the court's instructions were improper under *Salamon*, and he is entitled to a new trial. We conclude that although the court's instructions were improper, the impropriety was harmless beyond a reasonable doubt.

The defendant acknowledges that he did not challenge the court's kidnapping instruction at trial and that this claim is raised for the first time on appeal. The defendant's claim is based on our Supreme Court's decision in *State* v. *Salamon*, supra, 287 Conn. 509, which officially was released after the defendant's convictions in this case. The defendant requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). A defendant can prevail on an unpreserved constitutional claim under *Golding* "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. We conclude that the claim is reviewable because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002) ("[a]n improper

instruction on an element of an offense . . . is of constitutional dimension" [internal quotation marks omitted]). We further conclude, however, that the state has met its burden of proof that the instructional impropriety was harmless beyond a reasonable doubt, and, therefore, the defendant's claims fail under *Golding*'s fourth prong.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Nelson*, 118 Conn. App. 831, 858, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010).

"In *Salamon*, our Supreme Court reconsidered its interpretation of Connecticut's kidnapping statutes. . . . Ultimately, the court concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim.

Stated otherwise, to commit a kidnapping in conjunc-
tion with another crime, a defendant must intend to
prevent the victim's liberation for a longer period of
time or to a greater degree than that which is necessary
to commit the other crime. . . . The court stated that
[the] holding [in *Salamon* was] relatively narrow and
[that it] directly affects only those cases in which the
state cannot establish that the restraint involved had
independent significance as the predicate conduct for
a kidnapping. . . . Additionally, the court stated: [A]
defendant may be convicted of both kidnapping and
another substantive crime if, at any time prior to, during
or after the commission of that other crime, the victim
is moved or confined in a way that has independent
criminal significance, that is, the victim was restrained
to an extent exceeding that which was necessary to
accomplish or complete the other crime. Whether the
movement or confinement of the victim is merely inci-
dental to and necessary for another crime will depend
on the particular facts and circumstances of each case.
Consequently, when the evidence reasonably supports
a finding that the restraint was not merely incidental
to the commission of some other, separate crime, the
ultimate factual determination must be made by the
jury. For purposes of making that determination, the
jury should be instructed to consider the various rele-
vant factors, including the nature and duration of the
victim's movement or confinement by the defendant,
whether that movement or confinement occurred dur-
ing the commission of the separate offense, whether
the restraint was inherent in the nature of the separate
offense, whether the restraint prevented the victim from
summoning assistance, whether the restraint reduced
the defendant's risk of detection and whether the
restraint created a significant danger or increased the
victim's risk of harm independent of that posed by the
separate offense." (Citations omitted; internal quotation
marks omitted.) Id., 858–59.

The defendant claims that, although the court's charge was proper under then existing law, because the court did not instruct the jury in accordance with the new principles set forth in *Salamon*, he is entitled to a new trial. The state argues that to the extent that we conclude that there was instructional impropriety by the court, any such impropriety was harmless beyond a reasonable doubt because it is clear that the jury's verdict would have been the same in the absence of the alleged impropriety. Although we agree with the defendant that the court's instructions were not consistent with the new principles enunciated in *Salamon*, we agree with the state that this impropriety was harmless beyond a reasonable doubt under the factual circumstances of this case.

The defendant argues that the new principles set forth in *Salamon* are relevant to this case because the kidnapping of the victim merely was incidental to the threatening charges. We do not agree. Section 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (C) terrorize him or a third person . . . ." Section 53a-62 (a) provides in relevant part: "A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person . . . ."

In *Salamon*, our Supreme Court specifically stated: "[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was

restrained to an extent exceeding that which was necessary to accomplish or complete the other crime." *State* v. *Salamon*, supra, 287 Conn. 547. Although the defendant argues that the kidnapping merely was incidental to the threatening charges, we simply find no support for such a contention in the record of this case. The restraint necessary, if any, for the defendant to have threatened and terrorized the victim in this case was minimal in comparison to the amount of time that he held her against her will in the car, ordering her to drive and then holding her while at Bryant's house. Certainly, the restraint exceeded "that which was necessary to accomplish or complete the other crime[s]." Id.

The state presented overwhelming evidence that the defendant had committed kidnapping in the first degree by ordering the victim to drive from Waterford to Niantic and by holding her in the car for more than one hour against her will with the intent to terrorize her. The state also presented evidence to support the two charges of threatening in the second degree, namely, that the defendant had threatened to "cap" the victim before ordering her to drive to Bryant's house, repeatedly had yelled at her and repeatedly had told her that his friends were going to rape her. The defendant's prolonged restraint of the victim in her car while forcing her to drive from Waterford to Niantic and while forcing her to remain in the car reasonably could not be considered merely incidental to either of the threatening charges.

After reviewing the record, we conclude that the improper instruction did not contribute to the jury's verdict, and, therefore, the impropriety was harmless beyond a reasonable doubt. The record contains no evidence that rationally could have led the jury to find that the defendant's restraint of the victim had been inherent in, or merely incidental to, the threatening crimes. See *State* v. *Hampton*, 293 Conn. 435, 463, 978

A.2d 1089 (2009). Accordingly, we conclude that the court's failure to instruct the jury in accordance with the principles enunciated in *Salamon* was harmless beyond a reasonable doubt.

## II

The defendant next claims that the court's instructions to the jury impermissibly misled the jury into thinking that it could use evidence without restriction in the consolidated cases despite the admittance of the evidence for the limited purposes of "intent, motive, absence of accident and as a continuing course of conduct." More specifically, he claims that "[t]he trial court's jury instructions consolidated two cases joined for trial into a single case where the trial court admitted evidence for specific limited purposes, but then instructed the jurors that they could use that evidence without restriction." The defendant made no request to charge the jury, and he did not take an exception to the charge as given. Accordingly, his claim is unpreserved, and he contends that he is entitled to a new trial under the plain error doctrine. See Practice Book § 60-5.

"[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . .

"[W]e recently clarified the two step framework under which [an appellate court] review[s] claims of

plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204–205, 982 A.2d 620 (2009).

The defendant argues that "[a]lthough no authority exists for the proposition that the trial court must give a limiting instruction, sua sponte, when two cases have been joined for trial and the evidence is cross admissible, no authority exists that permits a trial court to explicitly instruct the jurors that the use of the evidence in the two cases is unrestricted." He argues that the court, having explicitly given such an instruction in this case, committed plain error, thereby requiring reversal of the defendant's convictions. We disagree.

The defendant cites in his brief the following language from the court's charge: " 'Your verdict on any one count does not control your verdict on any other count in either information. Each charge against the defendant requires an independent determination of whether he is guilty or not guilty *considering only that evidence which applies to that particular charge.* There can be no spillover of evidence; that is, each count in each information must be judged solely on the strength of the evidence that applies to it without regard to the evidence in any other count. Your finding in any one count does not in and of itself establish a basis for similar findings in the other count. For all the practical purposes, the defendant is to be considered on trial separately in each information and in each count. *It is solely for you to determine whether or not evidence presented applies to a count or counts in one information or to a count or counts in both informations.'* " (Emphasis in original.)

Even if we were to agree with the defendant that the last sentence in this portion of the court's charge was improper, nonetheless, because the charge in its entirety fairly and accurately instructed the jury on the proper use of the evidence, we conclude that the defendant cannot demonstrate that our declining to grant relief under the facts of this case will result in manifest injustice. The court properly instructed the jury that the cases were joined for reasons of judicial economy and that the consolidation had no bearing on the defendant's guilt or innocence in either case. The court told the jury that each information and each charge must be viewed separately and that the evidence cannot spill over but that "each information must be judged solely on the strength of the evidence that applies to it without regard to the evidence in any other

count." Accordingly, the defendant has failed to establish that our declining to grant relief will result in manifest injustice. We conclude, therefore, that the court did not commit plain error.

## III

The defendant also claims that "[t]he trial court failed to instruct the jurors regarding the proper use of evidence admitted for a limited [purpose, thereby] depriving the defendant of a fair trial." The defendant neither requested a limiting instruction nor took an exception to the charge as given. He explains that he "recognizes that there is no authority for the proposition that the trial court must give a limiting instruction when two or more cases have been joined for trial and the evidence is cross admissible." He asks, however, that we invoke our supervisory powers in reviewing his claim and that we adopt a per se rule that "when two or more cases have been joined for trial, and the trial court determines that the evidence is cross admissible, the trial court must instruct the jurors that the proper use of that evidence is limited to the purpose for which the evidence was admitted." We decline the defendant's request.

"Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the

rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance where these traditional protections are inadequate to ensure the fair and just administration of the courts." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009).

In this case, the defendant could have filed a written request to charge, and he could have taken an exception to the charge as given. Although "it is the better practice for the trial court to instruct the jury whenever evidence is admitted for a limited purpose even when not requested to do so"; (internal quotation marks omitted) *State* v. *Atkins*, 118 Conn. App. 520, 535 n.13, 984 A.2d 1088 (2009), cert. denied, 295 Conn. 906, 989 A.2d 119 (2010); "[i]t is well established in Connecticut . . . that the trial court generally is not obligated, sua sponte, to give a limiting instruction." (Internal quotation marks omitted.) Id., 535; see also Conn. Code Evid. § 1-4 ("court may, and upon request shall, restrict the evidence to its proper scope"). "The failure by the court to give, sua sponte, an instruction that the defendant did not request, that is not of constitutional dimension and that is not specifically mandated by statute or rule of practice is not so egregious that it affects fundamental fairness or the integrity of and public confidence in the judicial proceedings." *State* v. *Atkins*, supra, 535–36. Our supervisory powers are reserved for extraordinary circumstances that simply are not implicated by the present case.

The judgments are affirmed.

In this opinion the other judges concurred.