STATE OF CONNECTICUT *v.* JORGE P.[1]
(AC 29986)

Bishop, Gruendel and Schaller, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Argued April 13—officially released September 28, 2010

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Colleen P. Zingaro*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Jorge P., appeals from the judgment of conviction, following a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), seven counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and seven counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[2] On appeal, the defendant claims that the trial court improperly (1) admitted the opinion of an expert witness on the ultimate issue in the case, (2) referred to the complainants as "victims" during the trial, (3) instructed the jury by failing to articulate the factual basis for each of the charges against the defendant and (4) instructed the jury on risk of injury to a child by omitting the limiting judicial gloss of *State* v. *Schriver*, 207 Conn.

---

[2] The conduct charged in this case occurred on various dates between May, 2000 and 2005. We note that § 53-21 was amended in 2000 and 2002. See Public Acts 2000, No. 00-207, § 6; Public Acts 2002, No. 02-138, § 4. Those amendments have no bearing on the merits of this appeal. For convenience, we refer to the current revision of the statute.

456, 542 A.2d 686 (1988).[3] We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. The victims, S and G, are sisters who were born in 1993 and 1997, respectively. At the time of trial in 2007, S was fourteen years old and G was ten years old. Between 2000 and 2002, the victims lived with their parents and younger brother in a second floor apartment in a multi-family home on W Street. The victims' aunt, C, the defendant, who is C's boyfriend, their three children, and numerous other family members lived in the first floor apartment. In 2002, the victims, with their parents, moved to a house on W Avenue. In 2003, C and the defendant moved to a house on S Avenue.

While the victims lived at W Street, both of their parents worked. Their mother regularly took them to the defendant's apartment in the mornings before school started to be watched by C until their school bus came. S would normally watch television in the bedroom of one of her cousins. On many occasions, the defendant would take her to a rarely used interior front staircase of the multifamily home and touch her. Specifically, the defendant would pull down both his and S's pants, make S face the bottom of the stairs, touch her vagina, and rub his penis on her buttocks and against her vagina. S testified that this would happen "most of the days of the week, but it wasn't like every single day, but it would happen very often." Afterward, the defendant would give S toys, stickers or candies so she would not tell anyone about the incidents. S recalled two specific incidents of touching by the

---

[3] We note that the defendant claimed, in the alternative, that the evidence was insufficient as a matter of law to support the conviction of risk of injury to a child under § 53-21 (a) (1) and that the statute as applied to him is void for vagueness. Given our resolution of the defendant's fourth claim, we need not address this issue. See footnote 10 of this opinion.

defendant on W Street. One incident occurred when the defendant abruptly stopped touching her when he heard the doorknob turn at the top of the stairs. On that occasion the defendant pushed S aside, which caused her to cut her "pinky" on some mirrors that were on the stairs. Another incident occurred in the summer. On that occasion, when S went to the basement to get a scooter, the defendant followed her, and started touching her and engaged in penile-vaginal intercourse with her. Afterward, when S went to the bathroom, she felt something on her leg that was like a "white jelly kind of thing." She felt a wetness in her pants and, after using the toilet, saw a condom in the toilet.

The defendant continued this behavior after the victims' family moved out of the apartment on W Street in 2002. S recalled three specific incidents of touching while visiting her cousins at the defendant's house on S Avenue, where he had moved in 2003. One incident occurred when the defendant picked up S and G to take them to an airport because C was returning from a trip. Before going to the airport, the defendant took them to S Avenue and would not let S leave until she allowed him to touch her. The defendant penetrated her vagina digitally and rubbed his penis on her buttocks. Another incident occurred when the defendant took S and G to a carnival. Before taking them to the carnival, the defendant took them to S Avenue and told S that he would pay for the tickets and tokens only if she allowed him to touch her. During this incident, while playing hide-and-seek, G walked in on the defendant while he was touching S. G testified that she saw the defendant's hand in S's pants and knew it was inside her vagina "because it happened to me also." Another incident occurred when the defendant took S to a Wal-Mart store and allowed her to get a Britney Spears CD and an Eminem poster as late birthday gifts. After

making the purchases, the defendant refused to give them to S unless she allowed him to touch her. After the defendant touched S, he gave the gifts to her.

The defendant also touched G at his house on S Avenue approximately ten or fifteen times. G could recall only a few specific incidents. The defendant always gave her toys, stickers or candies after touching her. The first incident occurred when G spent the night at C's house at S Avenue. The defendant called G into his room and put his finger "a little inside" her vagina. After the incident, the defendant gave G bubblegum.

All of the incidents occurred between 2000 and 2005. S and G first disclosed the defendant's conduct in 2006. At that time, S was sick with a high fever and stomach ache. S's mother indicated her intention to take S to the emergency room. G wanted to accompany S and her mother to the emergency room so she could get stickers, but her mother refused. G then responded, "when . . . people touch you, they give you stickers and candies." After further questioning, both S and G disclosed that the defendant gave them toys, stickers or candies after touching them. In 2007, S's and G's guardian ad litem referred them to Veronica Ron-Priola, a physician, for a physical examination, because none had been done previously. A physical examination by Ron-Priola revealed that G had a mild protrusion of the urethra, which was normal, and that S had complete transection of the hymen, which was indicative of blunt trauma penetration into the vagina.

The defendant was charged, by way of a substitute long form information, with one count of sexual assault in the first degree in violation of § 53a-70 (a) (2), six counts of risk of injury to a child in violation of § 53-21 (a) (1) and six counts of risk of injury to a child in violation of § 53-21 (a) (2) in relation to S, and one count of sexual assault in the first degree in violation of § 53a-70 (a) (2), two counts of risk of injury to a

child in violation of § 53-21 (a) (1) and two counts of risk of injury to a child in violation of § 53-21 (a) (2) in relation to G. During trial, the state filed an amended information.[4] Following a jury trial, the defendant was convicted on all counts of the information. The court sentenced the defendant to a total effective term of thirty-two years incarceration and lifetime sex offender registration. This appeal followed.

I

On appeal, the defendant claims that the court improperly admitted the opinion of an expert witness on the ultimate issue in the case. Specifically, he argues that he was deprived of a fair trial because the court impermissibly allowed Ron-Priola to testify, both directly and indirectly, as to the ultimate issue of whether S and G were sexually abused. We decline to review this unpreserved evidentiary claim.

Our review of the record reveals that the defendant offered no objection at trial to Ron-Priola's testimony, which renders this claim unpreserved.[5] He requests

---

[4] After the state rested, the defendant made an oral motion for a judgment of acquittal, which the court denied. During argument on the motion, however, the prosecutor stated that she was withdrawing counts ten and eleven of the state's substitute long form information, which alleged risk of injury to a child as to S, pursuant to § 53-21 (a) (1) and (2), respectively, because there had been no specific testimony to support those charges. See footnote 10 of this opinion. The state thereafter filed a sixteen count amended long form information, charging the defendant, as to S, with one count of sexual assault in the first degree, pursuant to § 53a-70 (a) (2), and five counts each of risk of injury to a child, pursuant to § 53-21 (a) (1) and (2), respectively, and, as to G, with one count of sexual assault in the first degree, pursuant to § 53a-70 (a) (2), and two counts each of risk of injury to a child, pursuant to § 53-21 (a) (1) and (2). The jury found the defendant guilty of all sixteen counts.

[5] The defendant argues that this claim is preserved properly. Specifically, the defendant argues that *before* the state's offer of proof was made, he unsuccessfully objected to Ron-Priola's testimony in its entirety on the ground that she would be improperly testifying about the ultimate issue and on S's and G's veracity by stating that they had been sexually abused, and, therefore, he did not have to continue to object each time Ron-Priola stated her opinion on the ultimate issue. We disagree.

plain error review. See Practice Book § 60-5. "[T]he plain error doctrine . . . is not . . . a rule of review-ability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks

Although the record demonstrates that the defendant raised concerns to the court that Ron-Priola might be testifying as to the ultimate issue in the case, the defendant essentially argued to the court that an offer of proof was necessary to determine exactly what Ron-Priola would testify about. Contrary to the defendant's argument on appeal, the record reveals that the defendant did not object to Ron-Priola's testimony on the ground that she would be improperly testifying on the ultimate issue prior to the offer of proof. Rather, defense counsel was seeking an offer of proof to determine what Ron-Priola would be saying in her testimony. The following colloquy occurred before the court:

"[Defense Counsel]: Okay. And then that brings me to my final basis . . . my thoughts about the admissibility of the testimony is, this doctor—I mean, this is why we need an offer of proof, Your Honor. . . . I don't see how a doctor . . . can state to a reasonable—absent the testimony of the victims, given the length of time frame from the alleged disclosure, which is even more removed from the date of the alleged abuse, how this doctor can say, given to a reasonable degree of medical probability, that this child was sexually assaulted by [the defendant]. She can say that the—the fact that the hymen was perforated—

"The Court: I don't think that's what she's going to say. . . . I think that she's going to say that there's evidence of sexual abuse and that the victim told me that the source of the abuse was [the defendant].

"[Defense Counsel]: All right. Well, I, you know, I don't know . . . .

"The Court: I don't think her testimony is going to be, there is sexual abuse; ergo, it had to be [the defendant].

"[Defense Counsel]: Well, I don't know what she can say—that's why we . . . need the offer of proof . . . . [I]s it indicative of sexual abuse or is it indicative of intercourse?

"The Court: Fair question for cross-examination.

"[Defense Counsel]: I agree."

omitted.) *State* v. *Strong*, 122 Conn. App. 131, 144, 999 A.2d 765 (2010).

This is not an appropriate case for application of the plain error doctrine. Our review of the record does not convince us that any statement made by Ron-Priola that could be construed to relate to the ultimate issue of whether S and G were sexually abused compromised the fairness or integrity of the defendant's trial or diminished public confidence in our judicial proceedings.

## II

The defendant next claims that the court improperly referred to the complainants as "victims" during the trial. Specifically, he argues that his due process rights to a fair trial were violated by the court's repeated references to S and G as "victims" because the court thereby indicated to the jury the court's belief that a crime had been committed against S and G and invaded the fact-finding province of the jury. The state agrees that the court's use of the term "victim" in referring to S and G was not proper but argues that the defendant was not deprived of a fair trial because the court's use of that term was isolated and sporadic, and the court properly referred to S and G in its charge to the jury. We agree with the state.

The defendant acknowledges that although the court used the word "victim" fourteen times during the trial, he did not object and that this claim is raised for the first time on appeal. The defendant requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). A defendant can prevail on an unpreserved constitutional claim under *Golding* "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the

defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. We conclude that the claim is reviewable because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Vilchel*, 112 Conn. App. 411, 439–40, 963 A.2d 658 ("a court's use of the term victim during its charge may deprive a defendant of his due process right to a fair trial"), cert. denied, 291 Conn. 907, 969 A.2d 173 (2009). We further conclude, however, that because the defendant has not demonstrated that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial, the claim fails under *Golding*'s third prong.

"In *State* v. *Cortes*, [84 Conn. App. 70, 86, 851 A.2d 1230 (2004), aff'd, 276 Conn. 241, 885 A.2d 153 (2005)], this court held that the trial court's pervasive use of the term [victim] in its jury charge deprived the defendant of a fair trial. The defendant in *Cortes*, convicted of crimes against his former girlfriend, disputed that any crime at all had been committed against the complainant. . . . At trial, the defendant objected to the use of the term victim, to no avail. . . . This court reasoned: In cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term victim is not inappropriate. In cases in which the fact that a crime has been committed is contested, and where the court's use of the term victim has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief

that a crime has been committed against the complainant. . . . As our Supreme Court opined in *Cortes*, the jury could have drawn only one inference from the trial court's repeated use of the term, where the very commission of a crime was at issue, namely, that the defendant had committed a crime against the complainant." (Citations omitted; internal quotation marks omitted.) *State* v. *Vilchel*, supra, 112 Conn. App. 440–41.

The defendant argues that the court acted improperly in using the word "victim," when referring to S and G, fourteen times during trial.[6] We do not consider the court's use of the term to be pervasive under the circumstances. The trial lasted eight days and yielded approximately 1300 pages of transcript. The court did not regularly use the term "victim" to identify S and G. Specifically, during trial, the court regularly referred to S and G in various ways, including their first names,

---

[6] Specifically, the defendant argues that the court improperly referred to S and G as the "victims" during the following instances: (1) the direct examination of Ron-Priola when the court stated that "just so the record remains clear . . . let's refer to victim one, victim two, [G], [S]"; (2) during a cautionary instruction to the jury about the constancy of accusation evidence, the court used the term "victim" three times when it stated, "You heard testimony, now, from the doctor regarding [S], victim number one, telling her—and now related to you by the doctor, that she had been penetrated by her uncle. I just want to tell you that—that statements such as that are used and admitted solely to corroborate or not corroborate the victim's testimony in court. These are out-of-court statements considered by you only in determining the weight and the credibility that you'll give the victim's testimony that you heard here in court"; (3) in a clarification posed by defense counsel, the court stated, "if you want to show her the document, that's fine, or—or refer to victim one, victim two, [S], [G], so we know who . . . we're referring to, please"; (4) while instructing a witness, the court stated, "Detective [Rachel] Halas, I know you know this, but whenever referring to the victims, we're only using first names, and any of the family members of the victims, we're only using first names. So, no last names of the victims or their family, okay?"; (4) when instructing other witnesses, the court stated, "[t]he victims, we're only referring to them by first names," "[a]nd with regard to the victims and their families, we are to use only first names," and, "no last names of the victims or the victims' families to be used."

"the alleged victims," "the complainants," and "Jane Doe No. 1" and "Jane Doe No. 2." Finally, in the majority of the instances in which the court used the term "victim," the purpose was either to clarify to whom the evidence pertained, S or G, or to indicate that full names were not being used to protect the identities of S and G. Moreover, it is clear from the court's instruction that the jury's role was to serve as the finder of fact; the court did not indicate any view that S and G were considered the victims of any crime. Accordingly, the defendant has failed to establish that a constitutional violation clearly exists and clearly deprived him of a fair trial.

## III

The defendant next claims that the court improperly instructed the jury by failing to articulate the factual basis for each of the charges against him. Specifically, he argues that his due process rights were violated because the court misled the jury by failing to indicate what evidence pertained to each particular count. We are not persuaded.

The defendant concedes that the issue of instructional error was not raised at trial and requests review under the doctrine set forth in *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude.

"In reviewing a constitutional challenge to the trial court's instructions, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled

in reaching its verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995). "In assessing whether a jury reasonably could have been misled by the court's instructions . . . it is always proper to consider whether the issues in the case are complicated." Id., 515.

In *Lemoine*, "our Supreme Court concluded that review of or comment on the evidence is not constitutionally mandated where the trial court, in the exercise of its sound discretion, determines that such commentary is not necessary and that the jury would be properly instructed and not misled in its absence. . . . In reaching that conclusion, the Supreme Court noted that [i]t has long been established that [i]n properly instructing the jury it may or may not be necessary for the court to recall the attention of the jury to the evidence and to the facts which the State and the accused respectively claim to have established, or to comment upon the evidence or express an opinion as to its weight, or as to what verdict would be proper if the jury should find certain facts to have been proved. . . . It is not necessarily error to omit all comment upon the bearing and weight of evidence; and generally the extent to which the court should discuss the evidence in submitting a case to the jury is, so long as in criminal cases the jury [is] not directed how to find [its] verdict, within the discretion of the trial judge." (Citation omitted; internal quotation marks omitted.) *State* v. *Youngs*, 97 Conn. App. 348, 366, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006).

In the present case, after the close of the evidence and final arguments of counsel, the court instructed the jury as to the law applicable to all of the charges against the defendant. The court then instructed the jury as to the elements that the state must prove as to

each of the crimes charged in the information in order to find the defendant guilty. The court's instructions specified the alleged victims to which the various charges against the defendant applied. Further, the issues presented were, by and large, uncomplicated, and the elements of the crimes with which the defendant was charged and the evidence presented were not difficult to understand. Moreover, the final arguments of counsel thoroughly reviewed the exhibits and testimony given by the witnesses. We conclude that it was not reasonably possible that the jury was misled by the court's failure to articulate what evidence pertained to each charge during its instructions and that no injustice to the defendant resulted by reason of the court's instructions. The defendant's claim fails to satisfy the third prong of *Golding*.

## IV

Finally, the defendant claims that the court improperly instructed the jury on risk of injury to a child by omitting the limiting judicial gloss of *State* v. *Schriver*, supra, 207 Conn. 456. Specifically, the defendant argues that the court deprived him of his fundamental rights to a fair trial and due process of law by omitting the limiting judicial gloss from its jury instructions on the offenses of risk of injury to a child in violation of § 53-21 (a) (1).

As a preliminary matter, we set forth the legal principles that govern our review of the defendant's claim and the applicable standard of review. The defendant failed to object to the instructions at trial and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995) ("an improper jury instruction as to an essen-

tial element of the crime charged may result in the violation of the defendant's due process right to a fair trial, and thus require the reversal of a conviction based upon that instruction"). Resolution of the defendant's claim turns on whether the court's instructions concerning the counts of risk of injury to a child in violation of § 53-21 (a) (1), without the limiting judicial gloss of *Schriver*, amounted to a clear constitutional violation that clearly deprived the defendant of a fair trial. We conclude that the defendant was not deprived of a fair trial.

"If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmlessness beyond a reasonable doubt. . . . [A] jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . . When a jury is misinstructed on an essential element of a crime and a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (Citation omitted; internal quotation marks omitted.) *State* v. *Haywood*, 109 Conn. App. 460, 470–71, 952 A.2d 84, cert. denied, 289 Conn. 928, 958 A.2d 161 (2008).

Section 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or

morals of any such child,[7] or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of [risk of injury to a child] . . . ."

In the present case, the defendant was charged under both § 53-21 (a) (1) and (2). In *Schriver*, our Supreme Court held that if the risked impairment is to the child's morals, § 53-21 proscribes acts performed "in a sexual and indecent manner."[8] (Internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 64 n.15, 644 A.2d 887 (1994).

---

[7] We note that our Supreme Court has long "recognized that subdivision (1) of § 53-21 [a] prohibits two different types of behavior: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the [child's] moral or physical welfare . . . and (2) acts directly perpetrated on the person of the [child] and injurious to his [or her] moral or physical well-being." (Internal quotation marks omitted.) *State* v. *Nathan J.*, 294 Conn. 243, 251–52, 982 A.2d 1067 (2009).

[8] Specifically, in *Schriver*, "[t]he defendant had been convicted under [the act] prong of § 53-21 after grabbing a thirteen year old girl by the waist and saying, Don't worry, all I want to do is feel you. . . . The court agreed with the defendant that [o]n its face, § 53-21 fails to articulate a definite standard for determining whether the conduct of the defendant in this case is permitted or prohibited. . . . Standing alone, the phrase any act provides no guidance to potential violators, police officers, or juries . . . . The court also agreed with the defendant that our prior case law had established a definitive gloss limiting the physical harm proscribed by the statute to instances of blatant physical abuse. . . . The court therefore concluded that the defendant's conviction must be vacated because his conduct fell short of the conduct at issue in those cases. . . . Recognizing that any effort to conform § 53-21 to the mandate of due process would necessarily entail a wholesale redrafting of the statute . . . which is the exclusive province of the legislature, the court left in place the authoritative judicial gloss prescribed under our case law limiting the type of physical harm prohibited by the act prong of § 53-21 to instances of blatant physical abuse. . . . Other than changes affecting sentencing, the legislature has not substantively amended this provision of the risk of injury statute since our decision in *Schriver*." (Citations omitted; internal quotation marks omitted.) *State* v. *Nathan J.*, 294 Conn. 243, 252–53, 982 A.2d 1067 (2009).

The following additional facts are relevant to our resolution of the defendant's claim. During trial, the state filed an amended long form information[9] charging the defendant with, inter alia, seven counts of risk of injury to a child in violation of § 53-21 (a) (1) and seven counts of risk of injury to a child in violation of § 53-21 (a) (2). The information in relation to § 53-21 (a) (1) states that the defendant "did an act likely to impair the morals of a child under sixteen years of age . . . ." The court instructed the jury on the elements of both § 53-21 (a) (1) and (2). The court did not instruct the jury under § 53-21 (a) (1) that the act had to be in a "sexual and indecent manner . . . ." General Statutes § 53-21 (a) (2). In the court's instruction under § 53-21 (a) (2), it did instruct the jury that to find the defendant guilty, it had to find that "the contact with the intimate parts took place in a sexual and indecent manner which was likely to impair the health or morals of the child." On the basis of the state's theory of the case at trial, the jury reasonably could have found the defendant guilty under § 53-21 (a) (1) for touching S and G in a sexually and indecent manner and for his actions precedent and subsequent to his acts of sexual touching, namely, isolating the victims, purchasing their silence and preventing their reporting of the abuse.[10]

---

[9] See footnote 4 of this opinion.

[10] We note that the parties on appeal disagreed on the underlying theory of the case at trial. The defendant argued that the conviction under § 53-21 (a) (1) was based solely on the acts of sexual touching. The state argued that the conviction under § 53-21 (a) (1) was based solely on the acts precedent and subsequent to the acts of sexual touching. "[I]t is well established that [o]ur rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *State* v. *Scruggs*, 279 Conn. 698, 718–19, 905 A.2d 24 (2006).

After reviewing the trial record, we conclude that the jury was free to find the defendant guilty based on either (1) the acts of sexual touching of S and G, coupled with the acts precedent and subsequent to the acts of sexual touching, or (2) solely based on the acts precedent and subsequent to the acts of sexual touching.

The clearest indication of the state's theory of the case occurred during its closing argument to the jury. Specifically, the prosecutor argued: "Now, let me just give you the definition under [subdivision one]. [Subdivision one] is—it's a somewhat broader section. It *not only relates to sexual contact but also relates to the defendant's actions likely to bring the child into an isolated area where he would have the opportunity to have contact.* It is defined (as read), any person who does an act likely to impair the morals of a child under the age of sixteen years of age. So, it's [a] broader section. *You can accomplish it without having contact with the intimate parts, although that did occur here.* Bringing the girls down in the basement, or bringing them into a—a room or bringing them to the area under the stairs, each of those things where—where he was trying to isolate them from other people so he had an opportunity to sexually assault them.

"Giving them candy, and—and telling them not to tell anybody. And, you know, if they had been hurt or injured or had some—any medical things related to that, they're not telling their mother about that. So, *it's—it's not just the action of having contact with the intimate parts, but everything that surrounds it. That's—that's as it relates to [subdivision one].*" (Emphasis added.)

Furthermore, during argument on the defendant's motion for a judgment of acquittal after the state rested, the state admitted that a single factual scenario formed the basis of the risk of injury counts pursuant to § 53-21 (a) (1) and (2) and did not assert any distinction between acts precedent and subsequent to the sexual touching with the sexual touching itself. Specifically, the following colloquy occurred between the court and the prosecutor:

"The Court: . . . As I understand it, you can tell me if I'm wrong, *on each allegation of risk, the state has charged under (a) (1) and (a) (2). In other words, on claimed factual scenario, two counts of risk, all right. State agree with that?*

"[The Prosecutor]: Yes, Your Honor.

"The Court: Okay. So, that means we essentially have eight allegations of risk charged both ways, okay. Now, [I] did a little research overnight, not . . . my questions here are not directed to, if the state could or could not charge under (a) (1) and (a) (2) for one factual scenario. I think the cases are pretty clear that they . . . can do that. . . . Here's my question. Do you want to address any specific factual scenarios and how they match or don't match with any of the allegations of risk? . . .

"[The Prosecutor]: . . . [T]he state is withdrawing counts ten and eleven, as there was not [any] specific testimony with regard to [the incidents alleged to have occurred in] June, 2004. And I . . . will address my comments to the other counts and the factual foundation for them . . . in a matter of course." (Emphasis added.)

We know that for each count of risk of injury to a child in violation of § 53-21 (a) (1), the jury found that the defendant touched S and G in a sexual and indecent manner based on its having found him guilty under § 53-21 (a) (2), which was based on the same factual scenario. Therefore, we know that the jury did not find the defendant guilty under § 53-21 (a) (1) solely based on his acts precedent and subsequent to the acts of sexual touching. As a result, we do not need to address the defendant's alternative claim

In this case, the constitutional impropriety, if any, was harmless beyond a reasonable doubt.[11] The seven counts of risk of injury to a child in violation of § 53-21 (a) (1) were associated with the seven counts of risk of injury to a child in violation of § 53-21 (a) (2), in that the conduct that led to the conviction of risk of injury to a child as to § 53-21 (a) (1) also led to the conviction as to § 53-21 (a) (2). Because the jury clearly found under § 53-21 (a) (2) that the defendant touched S and G in a sexual and indecent manner, the court's failure to instruct the jury that the act under § 53-21 (a) (1) had to be committed in a sexual and indecent manner was harmless error. There is no evidence in the record to support an inference that the defendant touched S's or G's private parts for innocent purposes, such as hygienic or medicinal concerns. Furthermore, over-whelming evidence supports the conclusion that the touching was done for indecent or sexual purposes. We are convinced beyond a reasonable doubt that any error in omitting the *Schriver* gloss from the jury instructions was harmless. See *State* v. *Kulmac*, supra, 230 Conn.

---

that the evidence, if premised solely on his acts precedent and subsequent to the acts of sexual touching, was insufficient to constitute risk of injury to a child and that the statute as applied to him is void for vagueness.

[11] We note that in *State* v. *LaBrec*, 270 Conn. 548, 561–62 n.1, 854 A.2d 1 (2004) (*Borden, J.*, concurring), Justice Borden, in his concurring opinion, recognized the overlap between *Golding*'s third and fourth prongs. Justice Borden stated: "I also note what seems to me to be an overlap in most cases—that is, in all cases that do not involve structural constitutional errors—between the second part of *Golding*'s third prong, namely, that the constitutional violation 'deprived the defendant of a fair trial'; *State* v. *Golding*, supra, 213 Conn. 240; and the fourth prong, namely, that 'if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' Id. They overlap because they are the same question. In other words, if the error was harmless, then the defendant was not deprived of a fair trial; or, if the defendant was deprived of a fair trial, then the error cannot be considered harmless. Put another way, an appellate court cannot decide whether a defendant was deprived of a fair trial—and, therefore, is entitled to a new, fair trial—without first deciding whether the error was harmless." *State* v. *LaBrec*, supra, 561–62 n.1.

72–74. "Under such circumstances, it would be a waste of judicial resources, and a pedantic exercise, to delve deeply into the constitutional merits of a claim that can appropriately be resolved in accordance with the relevant harmless error analysis." (Internal quotation marks omitted.) Id., 65. The defendant's claim therefore fails.

The judgment is affirmed.

In this opinion the other judges concurred.